**DYNACORE HOLDINGS CORPORATION and Dynacore Patent Litigation Trust, Plaintiffs,**

v.

**U.S. PHILIPS CORPORATION, et al., Defendants.**

**Dynacore Holdings Corporation and Dynacore Patent Litigation Trust, Plaintiffs,**

v.

**Sony Electronics Inc., et al., Defendants.**

**Nos. 01 CIV. 5012 LTS GWG, 01 CIV. 10798 LTSGWG.**

United States District Court, S.D. New York.

Feb. 11, 2003.

---

Gibbons, Del Deo, Dolan, Griffinger & Vecchione, By Peter T. Cobrin, Esq., David W. Denenberg, Esq., Oren J. Warshavsky, Esq., New York, for Plaintiffs.

O'Melveny & Meyers LLP, By George A. Riley, Esq., Luann L. Simmons, Esq., Rosemary B. Boller, Esq., San Francisco, CA, for Defendant Apple Computer, Inc. and acting for purposes of this motion on behalf of all Defendants.

## OPINION AND ORDER

SWAIN, District Judge.

Plaintiffs Dynacore Holding Corporation and Dynacore Patent Litigation Trust (collectively "Dynacore" or "Plaintiffs") have brought two separate actions, 01 Civ. 5912 and 01 Civ. 10798, alleging infringement of a patent for technology relating to networks that interconnect computers and related devices (each a "node") in "local area networks" or "LANs."[1] The patent has been assigned United States Patent No. 5,077,732 (hereinafter the " '732 Patent"). The claims of the '732 Patent are "directed generally to a method of communication between nodes within a network, wherein nodes have both enhanced and common [communication speed] capabilities." (First Amended Complaint for Patent Infringement and Jury Demand, *Dynacore Holdings Corp. v. U.S. Philips Corporation et al.,* dated July 5, 2001 (*"Philips* Complaint") at ¶ 22; *see also* Amended Complaint for Patent Infringement and Jury Demand, *Dynacore Holdings Corp. v. Sony Corporation of America, Inc. et al.,* dated January 22, 2003 ("Sony Complaint"), ¶ 19.) The Defendants in 01 Civ. 5012 and 01 Civ. 10798 include manufacturers of a variety of products, including semiconductors, printers and computers, which incorporate or utilize a certain digital interface known as the IEEE 1394 Standard for a High Performance Serial Bus ("IEEE 1394 Standard"). The IEEE 1394 Standard permits users to interconnect a variety of electronic devices. Plaintiffs allege generally that "[p]roducts incorporating the IEEE 1394 standard fall within the scope of the claimed subject matter of the '732 patent" and that "[t]he IEEE 1394 standard utilizes technology which falls within the scope of the claimed subject matter of the '732 patent." (Philips Complaint at ¶¶ 3, 25; Sony Complaint at ¶¶ 3, 24.) The complaints do not specify the patent claims allegedly infringed by

---

1. Plaintiffs have moved to consolidate the two actions. That motion is *sub judice,* pending resolution of the Defendants' motions for summary judgment each case.

implementation of the IEEE 1394 Standard.

Certain claim limitations of the '732 Patent were recently construed in litigation originally commenced by Plaintiffs' predecessor in interest. The claim construction in that case was affirmed by the United States Court of Appeals for the Federal Circuit in *Datapoint v. Standard Microsystems Corp.*, 31 Fed.Appx. 685 (Fed.Cir. 2002) (*"Datapoint"*). Defendants here have moved for summary judgment of noninfringement, arguing that networks of devices compliant with the IEEE 1394 Standard ("IEEE 1394 Networks")[2] do not read on a key limitation common to all of the independent claims of the '732 Patent, as that limitation is construed in *Datapoint*.

The parties have provided written submissions and presented oral argument, all of which the Court has considered carefully, in connection with the pending motion. For the reasons that follow, Defendants' motions for summary judgment in each of 01 Civ. 5012 and 01 Civ. 10798 are granted.

## BACKGROUND

Plaintiff Dynacore Holdings Corporation is the successor to Datapoint Corporation ("Datapoint"), which filed a petition for relief under the Bankruptcy Code in May 2000. In 1996, Datapoint filed actions in the United States District Court for the Eastern District of New York against certain defendants, alleging that the defendants had infringed the '732 Patent and a related patent (No. 5,088,879, hereinafter the " '879 patent") by the manufacture, use and/or sale of products conforming to an industry standard called "IEEE 802.3u"

(also known as "Fast Ethernet.") The district court appointed a Special Master, who was authorized, among other duties, to conduct a *Markman* hearing for claim construction purposes.[3]

The Special Master issued a report construing certain claims in the '732 the '879 patents (the "Master's Report"). The district court subsequently adopted the Master's Report. Datapoint appealed the district court's judgment to the Federal Circuit. In *Datapoint*, the Federal Circuit affirmed the Special Master's claim construction.

The '732 Patent, titled "LAN with Dynamically Selectable Multiple Operational Capabilities," relates to certain networks that connect nodes that communicate at a common speed, as well as nodes capable of communicating both at the common speed and at an enhanced speed, enabling the nodes to communicate with each other on a single network. Master's Report at 7; (United States Patent No. 5,077,732, Ex. C to Declaration of George A. Riley in Support of Defendant's Motion for Summary Judgment "Riley Decl." at 1.) The '732 Patent applies to such nodes that are connected in bus-type networks, *i.e.*, ones in which the nodes are interconnected through a single logical point such that communications from one device to another are generally delivered to all other devices on the network. Master's Report at 8. When a device communicates with another device in a bus-type network of the type to which the "732 Patent applies, the communication includes the address of the device to which the communication is directed." *Id.* In communications on such networks the transmitting devices ("source nodes") communicate with other nodes by

---

**2.** The term "network" is used here in a general sense, to connote interconnections of three or more nodes in accordance with the IEEE 1394 Standard.

**3.** *See generally, Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

including in their transmitted messages "address" information for the intended recipient node(s); nodes other than the addressee(s) ignore the transmission. *Id.* at 8. The devices that are connected to send and receive data communications over a LAN are referred to as "nodes." *See Datapoint,* 31 Fed.Appx. at 687.

Defendants here contend, and Plaintiffs do not dispute, that the '732 Patent includes but five independent claims, each of which incorporates the limitation "[i]nterconnecting all of the nodes as equal peers in a single network configuration." (Defendants' Mem. at 11.) Claim 31 of the '732 Patent ("Claim 31"), which was construed in the *Datapoint* litigation, includes this limitation and is the focal point of the instant motion practice. Claim 31 reads in its entirety as follows:

> A method of communicating information frames between at least three nodes in a local area network or LAN, comprising:
> interconnecting all of the nodes as equal peers in a single network configuration;
> communicating frames containing data between all of the nodes at a common communication capability and in accordance with a predetermined logical connectivity pattern;
> communicating frames containing data between at least two nodes at an enhanced communication capability and in accordance with a predetermined logical connectivity pattern, the nodes between which frames are communicated at the enhanced capability each being an enhanced node; and
> achieving a substantially different form of data frame communication over the medium between enhanced nodes than the data frame communication over the medium achieved between nodes at the common operation capability.

('732 Patent, Ex. C to Riley Decl., at col. 25.)

In the instant motions, Defendants argue that the limitation "equal peers in a single network configuration," as construed by the Special Master in the claim construction that was ultimately affirmed by the Federal Circuit in *Datapoint,* excludes IEEE 1394 Networks from the scope of all of the independent claims of the '732 Patent. (Defendants' Mem. at 12–13). Plaintiffs agree that meeting the "equal peers" limitation is a requirement of the claims at issue in this case. (Plaintiffs' Mem. at 11.) Defendants rely on *Datapoint*'s construction of the relevant Claim 31 limitations for purposes of the instant motions and argue that Plaintiffs are, in any event, estopped from challenging the claim construction affirmed by the Federal Circuit in *Datapoint.*

For the following reasons, the Court concludes that Defendants are entitled to judgment as a matter of law on the infringement issue and the instant motions are granted.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, a court should not resolve disputed issues of fact; rather, it simply must decide whether there is any genuine issue to be tried. *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994); *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir. 1988).

"Determining whether a patent claim has been infringed involves two steps: (1) claim construction to determine

the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998). Once the court has construed the relevant claims, the court must determine whether the plaintiff has proven by a preponderance of the evidence that the accused devices meet each and every element or limitation of the properly construed claims. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995); *Morton International v. Cardinal Chem. Co.*, 5 F.3d 1464, 1468 (Fed.Cir.1993). There can be no infringement as a matter of law if a claim limitation is not found in the accused device. *See Phonometrics Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1467 (Fed.Cir.1998).

*Collateral Estoppel*

Plaintiffs argue that Defendants' motion for summary judgment is premature because Defendants have not accepted the claim construction set forth in *Datapoint* as binding upon all the parties in these actions. Plaintiffs further contend that if Defendants seek to pursue claim construction of the '732 patent, this Court must construe the relevant claims of the '732 patent prior to deciding whether devices compliant with IEEE 1394 infringe the '732 Patent.

■ For purposes of the claim construction prong of the infringement analysis, Plaintiffs are collaterally estopped from relitigating the relevant claims construed in *Datapoint*. Collateral estoppel bars litigants from contesting matters that were actually litigated and decided in a previous action. *See Blonder–Tongue Labs. Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). In order for collateral estoppel to apply, four elements must be met: (1) the issues raised in both proceedings must be identical; (2) the relevant issues must have been actually litigated and decided in the prior proceeding; (3) the party to be estopped must have had a full and fair opportunity to litigate the issues in that prior proceeding; and (4) resolution of the issues must have been necessary to support a valid and final judgment on the merits. *See TM Patents, L.P. v. IBM*, 72 F.Supp.2d 370, 375–79 (S.D.N.Y.1999); *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa*, 56 F.3d 359, 368 (2d Cir.1995).

These principles may be applicable to bar a patent owner from relitigating a prior patent claim construction. *See TM Patents, L.P. v. IBM*, 72 F.Supp.2d at 375–79 (prior claim construction in action against alleged infringers barred patent owner from relitigating the claim construction against another alleged infringer); *Pfaff v. Wells Electronics, Inc.*, 5 F.3d 514, 518 (Fed.Cir.1993) ("where a determination of the scope of patent claims was made in prior case, and the determination was essential to the judgment there on the issue of infringement, there is collateral estoppel in a later case on the scope of such claims").

■ In this instance, the four elements of collateral estoppel plainly are met. In *Datapoint* and in the instant action, the issue concerned claim construction of the '732 Patent. The '732 Patent claim construction issue was fully litigated and decided by the courts in the *Datapoint* litigation and Datapoint, the predecessor in interest to Plaintiffs, the party to be estopped, had a full opportunity to litigate the claim construction issue in *Datapoint*. Finally, upon the district court's adoption of the Special Master's claim construction, Datapoint stipulated to summary judgment of non-infringement and appealed to the Second Circuit. The Second Circuit af-

firmed the district court's grant of summary judgment of infringement, thus reaching a final determination on the merits.

Accordingly, the *Datapoint* construction of the relevant claims in the '732 patent has preclusive effect upon Plaintiffs, which succeeded to Datapoint's interest in the '732 Patent following the judgment in that case. The issue of whether IEEE 1394 Networks meet the "equal peers" limitation of Claim 31, as construed in *Datapoint*, is thus ripe for adjudication. *See TM Patents, L.P. v. IBM,* 72 F.Supp.2d at 375–79.

*The Equal Peers Limitation*

■ Plaintiffs bear the burden of showing infringement of any claim of the '732 patent by demonstrating that each limitation of the claim reads on the accused IEEE 1394 Networks, either literally or by the doctrine of equivalents. *See Laitram Corp. v. Rexnord, Inc.* 939 F.2d 1533, 1535 (Fed.Cir.1991); *Hoganas AB v. Dresser Industries, Inc.,* 9 F.3d 948, 954 (Fed.Cir.1993); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 122 S.Ct. 1831, 1837, 152 L.Ed.2d 944 (2002). In opposing the instant motions, Plaintiffs do not seek to demonstrate infringement by invoking the doctrine of equivalents. Rather, they have confined their arguments to asserting literal infringement and/or that there are material issues of disputed fact relating to literal infringement.

As noted above, Claim 31 (as well, apparently, as each of the other independent claims in the '732 Patent) includes a limitation providing that the claimed invention constitutes "[a] method of communicating information frames between at least three nodes in a local area network or LAN, comprising: interconnecting all of the nodes as equal peers in a single network configuration." ('732 Patent, col. 25.)

Two of the limitations of Claim 31 further require that the method involve "communicating frames containing data" at the different operational capabilities (speeds). (*Id.*)

In the Master's Report, which was affirmed by the Federal Circuit in *Datapoint,* the Special Master concluded that:

> the phrase 'equal peers in a single network configuration' in a bus-type LAN requires that the nodes have direct access to all other nodes in the network so that all data frames transmitted by each node are heard by all other nodes, and that all nodes have the same right of access to each every other node in the network through a single logical point.

*See* Master's Report at 32.

Defendants argue that the "equal peers" limitation, as construed by the Special Master, fails to read on the IEEE 1394 Networks in three respects, each of which is (according to Defendants) a sufficient basis for a judgment of non-infringement. First, Defendants assert that 1394 Networks cannot satisfy the relevant limitation because, due to their tree-like physical configuration, which requires nodes to repeat or relay communications from one to another, they do not provide each node with the "direct access to all other nodes in the network" required by the Special Master's construction of the "equal peers" limitation. Second, Defendants assert that IEEE 1394 Networks fail to meet the "equal peers" limitation because they are "hierarchical" in that nodes are physically connected in a tree-like configuration and certain arbitration protocols that determine priority of network communications when more than one node seeks to communicate at the same time assign traffic priority to nodes on a hierarchical basis. This feature of the IEEE 1394 Standard is, Defendants argue, inconsistent with the

limitation's requirement that nodes be equal for purposes of network communications capability. Third, Defendants argue that IEEE 1394 Networks fail to meet the Special Master's requirement that "all data frames transmitted by each node are heard by all other nodes" because, under the IEEE 1394 Standard, there are circumstances in which such data frames are not transmitted to all of the other nodes on the IEEE 1394 Network. The Court agrees that IEEE 1394 Networks fail to meet the "equal peers" limitation in this third respect. Accordingly, the Court does not address Defendant's other contentions.

In addition to construing the "equal peers" limitation, the Special Master specifically addressed the meaning of the terms "frames containing data" and "data frames" as used in Claim 31. The Special Master rejected Datapoint's contention that the reference to "data frames" encompasses any signal on the physical layer of network communications that is recognized by a node, holding, rather, that "Claim 31 explicitly refers to 'frames containing data' or 'data frames' and not simply some generic concept of frame." Master's Report at 50. The Special Master concluded: "[i]n the '732 Patent the phrase 'frames containing data' or 'data frame' is intended to refer to the frames formulated above the physical layer which comprise data communication between nodes, and not other physical layer signals which may exist in the network." *Id.* at 51. "Data frames are intended in the patent to be formatted frames originating above the physical layer which, in a bus-type LAN, have a source and destination address and are intended to be exchanged between nodes." *Id.* at 52.

The Special Master further concluded that,

As used in Claim 31, 'node' and 'frame' play off each other. Claim 31 repeatedly requires the communication of data frames between nodes. It requires communicating 'frames containing data between all of the nodes' at one capability and communicating 'frames containing data between at least two nodes' at another capability, so as to achieve a substantially different form of 'data frame communication over the medium between enhanced nodes' than the form of 'data frame communication over the medium achieved between nodes' at the common capability. As used in this claim, 'data frame' communication between 'nodes' refers to the sending and receiving of frames formulated above the physical layer using destination addresses and communicated between nodes having such addresses. It does not encompass maintenance or link integrity signals that may be passed individually between link partners in a network to test link integrity or establish communication rates or other details of physical layer link partner relations.

*Id.* at 54.

The United States Court of Appeals for the Federal Circuit affirmed the Special Master's claim construction, holding in *Datapoint* that "[t]he specification makes clear that the claims are limited to LANs with nodes arranged as 'equal peers.'" *Datapoint,* 31 Fed.Appx. at 689. Datapoint had argued on appeal that it was error to construe claim term "equal peers" in Claim 31 "to mean that nodes must have direct access to all other nodes in the network so that all data frames transmitted by each node are 'heard' by all other nodes." *See id.* at 690. Datapoint further argued that it was error to require all nodes to "hear" each communication, asserting that the patents in suit did not require each communication to traverse the entire network. *Id.* 31 Fed.Appx. at

691. The *Datapoint* Court found Datapoint's argument inconsistent with the '732 Patent:

> To the contrary, the '732 Patent specification makes quite clear that (1) all data being sent over the network have a source and destination address, and (2) all nodes review the data to determine whether they are the intended recipient of the transmitted message. *See e.g.*, '732 patent, col 5, lines 12–17. ('Since *all* of the other nodes on the LAN also receive the signals transmitted by the source node, the address of the destination mode is utilized *by each node on the network* to recognize and accept only those transmissions addressed to it, while discarding or not recognizing the other transmissions not addressed to it.') (emphases added). Accordingly, the Master's construction requiring that each node 'hear' (as opposed to process or otherwise manipulate) every communication, simply reflects the inherent fact that each node must 'hear' a communication before it can 'recognize and accept only those transmissions addressed to it.' Viewed through this prism, we agree with the Master's construction.

*Id.*

As to the Special Master's construction of the terms "frames containing data," the Federal Circuit held:

> Datapoint's proposed definition [of frames containing data as 'only a series of signals that are applied by a node to a communication medium,'] is better suited to frames than to 'frames containing data ....' The written description in the '732 patent facially distinguishes 'frames containing data' from simple 'frames.'
>
> \* \* \* \* \* \*
>
> One may readily observe ... that 'frames containing data' are groups of frames—*e.g.*, inquiry frames, response frames, data packet frames, and token frames—that achieve given network functionality. Consequently, it does not appear to us ... that the Special Master's claim construction in any way limits the term 'frames containing data' to a specific type of frame. Rather, it properly recognizes the inherent distinction between 'frames' and 'frames containing data.'
>
> \* \* \* \* \* \*
>
> Accordingly, the Special Master's construction of 'frames containing data' was correct.

*Id.* at 693. The Court concluded: "For the foregoing reasons, we see no error in the Special Master's claim construction and, accordingly, in the district court's adoption of that construction in its entirety. We therefore affirm." *Id.* at 695.

To prove their infringement claims, Plaintiffs have the burden of demonstrating that the accused IEEE 1394 Networks and/or related devices meet each and every element or limitation of the '732 Patent's claims as construed by the Special Master. Defendants are, accordingly, entitled to summary judgment of noninfringement if the accused IEEE 1394 Standard-compliant devices and uses do not meet the "equal peers" limitation of Claim 31 and there is no material disputed issue of fact relating to the applicability of the "equal peers" limitation to the accused products.

The Court finds that the IEEE 1394 Standard itself makes clear that compliant devices in network configuration do not satisfy the "equal peers" limitation of Claim 31. There are no material issues of fact in dispute because there is no need to go beyond the *Datapoint* claim construction and the clear language of the IEEE 1394 standard.

As shown above, the Special Master specifically found that the claim term "equal peers in a single network configuration" requires, *inter alia*, that "all data frames transmitted by each node are heard by all other nodes." This requirement that all data frames be heard by all other nodes was upheld by the Federal Circuit. *See Datapoint*, 31 Fed.Appx., at 691. The IEEE 1394 Standard makes it plain that, in an IEEE 1394 Network, communications do not always occur across the entire system and therefore that all communications are not heard by all nodes.

A brief overview of the IEEE 1394 Network operation is in order here. The physical setup of an IEEE 1394 Network consists of point-to-point cable connections. The physical connections are solely to ports of neighboring devices. The system simulates a serial bus by repeating communications from node to node in the system. (*See* IEEE Standard for a High Performance Serial Bus, Ex. A to Declaration of Dr. Eric W. Anderson in Support of Defendants' Motion for Summary Judgment ("IEEE Standard") at ¶ 3.2.1.) Like the invention claimed in the '732 Patent, the system is capable of handling communications at common speed and from devices that operate at enhanced as well as common speeds. (*Id.* ¶ 1.1.) The IEEE 1394 Standard system, using cables to connect the nodes, "translates this physical point-to-point topology into the virtual broadcast bus expected by higher levels." It does this "by taking all data received on one port, resynchronizing it to a local clock, and repeating it out of all its other ports." (*Id.* ¶ 3.7.3.) "The cable and [device] ports act as bus repeaters between

the nodes to simulate a single logical bus." (*Id.* ¶ 3.2.1.) On initial configuration and the addition of new nodes to the network (bus initialize), the nodes "handshake" their neighbors to learn respective communication speed capabilities, and the system configures itself as tree with root, branches, leaves. (*Id.* ¶¶ 3.7.3—3.7.3.3.) The root branch system is used to arbitrate requests[4] for use of the system. Requests to transmit data are processed up a parent/child/leaf/branch topological configuration to the root, which gives or denies permission to transmit communications on bus. Access is denied to other nodes on the bus during this process through data prefixes sent downstream by parent nodes. (*Id.* ¶ 3.7.3.2(b).) A data prefix signal also sent by a node granted transmission access to bus, "to warn all other nodes that data is about to be sent." (*Id.* ¶ 3.7.3.2(d).)

The "speed signaling" description section of the IEEE 1394 Standard explains that a "speed code" is sent during a "data_prefix" phase of arbitration in IEEE 1394 system and that the operational speed capabilities of the various nodes configured into the network is determinative of whether all of the data being communicated is in fact sent to all of the nodes in the network:

> If a directly attached node is incapable of receiving high-speed data, then it is not sent any clocked data; instead, the data_prefix is continually sent on that port until the packet is complete. This will keep the slower attached node from arbitrating while the high-speed data is sent out through the other port(s). *Since the slower node propagates the*

---

4. "Request" is defined as a "subaction with a transaction code and optional data sent by a node (the requester) to another node (the responder)." (*Id.* ¶ 2.2.71.) "Subaction" is "a complete link layer operation: arbitration, packet transmission and acknowledgment.

The arbitration may be missing when a node already controls the bus, and the acknowledge is not present for subactions with broadcast addresses or for isochronous subactions." (*Id.* ¶ 2.2.82.)

*data_prefix to its other ports, all devices 'downstream' from that node will also be kept from arbitrating.*[5]

\* \* \* \* \* \*

*Although this process guarantees that all nodes will arbitrate correctly, it is still possible for slower [nodes] to act as blocking points for higher speed packets.*

(*Id.* ¶ 3.7.3.3.) (emphasis added).

The foregoing specifications of the IEEE 1394 Standard make clear that (i) a "data_prefix" is separate from the portion of a transmission that contains address and source information and data, and that (ii) when a high-speed node is transmitting at high speed, low-speed nodes downstream of the transmission receive only the data_prefix and not the address, source information or data. Because the low speed downstream nodes repeat only what is transmitted to them when functioning as part of the logical bus, any nodes further downstream of those devices also receive only the data_prefix and not the address, source information or data. Thus, the IEEE 1394 Standard itself is incompatible with the requirement of the "equal peers in a signal network configuration" aspect of Claim 31 which, as construed by the Special Master and affirmed by the Federal Circuit, requires that "all data frames transmitted by each node are heard by all other nodes" (Master's Report at 32; *Datapoint* at 691–92), where the term "data frames" or "frames containing data" is further construed to require the inclusion of address information to enable nodes to determine whether transmissions are intended for them. *See Datapoint,* at 692.

Since address and source information is not transmitted as part of the data_prefix, the data_prefix cannot be used by the downstream low-speed nodes, or any nodes receiving transmissions repeated by those nodes, to determine whether the transmissions are addressed to them and thus cannot constitute a "data frame" within the meaning of the *Datapoint* construction of the "equal peers" limitation of Claim 31 of Plaintiffs' '732 Patent. *Cf. Datapoint,* 31 Fed. Appx. at 691 ("the Master's construction requiring that each node 'hear' . . . every communication, simply reflects the inherent fact that each node must 'hear' a communication before it can 'recognize and accept only those transmissions addressed to it.' ")

The IEEE 1394 specification is similarly incompatible with the Special Master's construction of Claim 31 to require that communications of "frames containing data" occur over the entire bus-type LAN medium "and be heard by all nodes." *Id.* at 692.

Plaintiffs have proffered the expert declarations of Kendyl Roman and Stephen Verderese in opposition to Defendants' motion for summary judgment. Plaintiffs' experts assert that the transmission of the data_prefix to all nodes on the network is sufficient to meet the limitation's requirement that all nodes "hear" all communications. (*See* Declaration of Kendyl Roman in Opposition to Defendants' Motion for Summary Judgment "Roman Decl." at ¶¶ 71–76.) Verderese asserts, in addition, that under the IEEE 1394 Standard, the downstream common (low) rate node

---

**5.** "Packet" is defined as "A serial stream of clocked data bits." (*Id.* ¶ 2.2.54.) "Data packet transmission" is defined as follows: "for asynchronous subactions, the source node sends a data prefix signal (including a speed code, if needed), addresses of the source and destination nodes, a transaction code, a trans-

action label, a retry code, one or two cyclic redundancy checks (CRCs) and a packet termination (either another data prefix or data end signal). Isochronous subactions include a short channel identifier rather than source or destination addresses and do not have the transaction label or retry code." (*Id.* ¶ 3.6 2.)

passes on all information it receives and that, "[i]n a worst-case scenario, the common rate node will slow down the high-speed communication either physically or by bus management wherein only the common rate will be sent through the common node. However, it does not stop the communication nor does it change the fact that all nodes hear all communications." (Declaration of Stephen Verderese in Opposition to Defendants' Motion for Summary Judgment "Verderese Decl." ¶ 26; *see also* Roman Decl. ¶ 79.) ("In IEEE 1394, every frame has a starting delimiter (data prefix) and every frame has an ending delimiter, a termination signal (either another data prefix or data end). In IEEE 1394, every frame is 'heard' by every node and can be 'seen at each cable segment.' (Ex. 2, p. 3).") These assertions are plainly inconsistent with the language of the IEEE 1394 Standard, which clearly provides that the data portion of a high-speed frame or packet transmission is *not* transmitted or repeated downstream to, or through, a low-speed or common rate node. (*Cf.* IEEE 1394, ¶ 3.7.3.3) Plaintiffs' expert affidavits thus fail to frame a genuine issue of material fact for trial with respect to this aspect of the infringement analysis.

■ Plaintiffs further contend that, even if the Court finds that there is no equal access to the bus under the IEEE 1394 Standard because the IEEE 1394 arbitration protocol blocks complete transmission to all nodes during certain configurations of the network, there are circumstances, such as when common speed transmissions are not simultaneous, where all node do function as "equal peers" throughout the network. Plaintiffs contend that "if there is equal access and 'equal peers' in other configurations, there is infringement." (*See* Plaintiff's Mem. at 13.) Plaintiffs invoke the general principle

that an accused product which sometimes, but not always, embodies a claimed method nonetheless infringes. *See Bell Communications v. Vitalink Communications Corp.*, 55 F.3d 615, 623 (Fed.Cir.1995); *Interspiro USA Inc. v. Figgie International, Inc.*, 815 F.Supp. 1488, 1512 (D.Del.1993) *aff'd*, 18 F.3d 927 (Fed.Cir.1994); *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 20 (Fed.Cir.1984). In the cases cited by Plaintiffs in support of their argument, the courts looked to the specific claim construction at issue to determine whether the accused product embodied the claim at issue. Thus, in *Bell Communications*, the patentee claimed a method where a source device in a multiple LAN environment assigned a "spanning tree" to arbitrate communications among the LAN. The court determined that there was a fact issue as to whether the accused product, which also provided a method for arbitrating transmissions in a multiple LAN environment, ever employed the arbitration method set forth in the claims of the patentee. *See Bell Communications*, 55 F.3d at 622–23. In *Interspiro*, the court determined that, in certain modes of the operation, an accused mechanical product operated in a way that embodied the claimed mechanical operation of the patentee's product. *See Interspiro*, 815 F.Supp. at 1512. In *Paper Converting Machine Co.*, the court determined that a competitor's product which was manufactured for use after the expiration of a patent infringed because, although the accused product was not fully operational, it embodied certain elements of the patented product. *See Paper Converting Machine Co.* at 19–20. In each of these cases, the accused product read on the claims of the patent, as construed at certain times or in certain instances and such sporadic infringement was within the claims.

Here, the specific construction of Claim 31 of the '732 Patent precludes the "in-

fringement some of the time" analysis employed in the foregoing opinions. The relevant requirement that *"all* data frames transmitted by *each* node are heard by *all* other nodes" (Master's Report at 32; *Datapoint* at 691–92) (emphasis supplied)—cannot be interpreted to permit a finding of infringement where transmissions are heard by all other nodes only some of the time.

Defendants are therefore entitled to summary judgment of non-infringement, because the IEEE 1394 specification's potential "for slower [nodes] to act as blocking points for higher speed packets" precludes IEEE 1394 Standard-compliant systems from meeting the "equal peers in a single network configuration" limitation of the '732 Patent as construed in *Datapoint.*

### CONCLUSION

Because there is no genuine disputed issue of material fact as to the ability of IEEE 1394 Standard-compliant devices, when configured as a network, to satisfy the "equal peers in a single network configuration" claim limitation of Plaintiffs' '732 Patent, Defendants are entitled as a matter of law to summary judgment of noninfringement. Defendants' motions for summary judgment are, accordingly, granted.

IT IS SO ORDERED.